[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was instituted by the plaintiff (PLTF) in February 1992, seeking a dissolution of the marriage, an assignment out of the defendant's (DEFT) estate, etc. The DEFT in turn, in her answer and cross-complaint, admits the PLTF's allegations and seeks a dissolution, alimony, a division of the jointly-owned estate, counsel fees, name change, etc. The parties appeared with counsel and testified. On the basis of the evidence presented the following findings and conclusions are made.
1. The parties were married at East Haven, Connecticut on November 22, 1981. The DEFT's maiden name was Saccavino.
2. Both have lived in Connecticut continuously for more than one year preceding the commencement of this action.
3. No minor children have been born to the parties during this marriage.
4. The parties at the times of the hearings had not prior thereto received any state or town aid, nor were they then receiving such aid.
5. Both of the parties were married once before; and for each of them the prior marriage had ended by divorce.
6. The DEFT had previously married a cousin of the PLTF. This marriage ended in 1970, and a male was born of this union.
7. The parties met in 1981 and were married some two months thereafter. The DEFT's son was then almost sixteen years old, and the DEFT was gainfully employed. She had for the previous eleven years supported herself and her child with some financial aid from her first husband.
8. The DEFT in her lifetime and so during the course of this marriage has had a number of varied employments, all of CT Page 5155 which she secured through her own efforts. A number of these occurred in restaurants as a waitress, clothes checker, tending bar, cocktail waitress, and at one time for a period of one year or more she was on salary as the manager.
9. At the time of her marriage to the PLTF, she was earning $300 per week plus tips as a waitress. She was then earning more than the PLTF who was a teacher in New Haven.
10. The PLTF had started his teaching career in the fall of 1969 and completed it in June 1983. After, about one year into the marriage, he discussed with the DEFT whether he should change careers and go into law. He testified that the DEFT never objected to his contemplated change. She testified, however, that she objected because she felt insecure. At this point, I accept her version. She went on to testify that she was afraid that he would leave her upon completion of his studies. This I believe was based on the actual state of affairs that developed rather than a premonition. She also concluded that bit of testimony by stating that afterward she agreed to the change and supported him one hundred percent. On the basis of subsequent conduct of hers, I cannot accept this. She also concluded that piece of testimony stating that she still did not like it. This I do accept.
11. DEFT testified that the PLTF decided to attend law school in southern Florida so that they could be near her parents during the customary three years of schooling. The PLTF testified that he made this selection also because his wife had expressed a desire to live in Florida. She also has a sister who lives in Florida and is engaged in real estate work. The PLTF was accepted at Nova University in January or February of 1983. At that time, the parties agreed to be together in southern Florida for his schooling.
12. The DEFT opted to announce to the PLTF that she had changed her mind and would not accompany him to be with him at law school. This announcement was made while the parties were having lunch at a New Haven restaurant, Consiglio's. Further, it was announced in August, 1983, some two or three weeks before he was to leave New Haven and after he had paid $2,000 for his tuition. She stated, as the reason or her change, that she wished to remain to be with her son who had CT Page 5156 received a baseball scholarship to the University of New Haven. However, her son who had been living with the parties for over a year, had left the home of the parties prior to her announcement and was living then in his own apartment. I accept the PLTF's testimony that he would not have proceeded with Florida if the DEFT had given him sufficient advance notice. PLTF further testified that this was disheartening to him and made his first automobile trip to school a long and disconsolate one. Again, I accept this testimony. I do not believe the DEFT was sincere in stating her reason for not going.
13. The DEFT testified again that she did not know initially how much his tuition would be, nor did she ask him what the cost would be or how he was going to pay to obtain his law degree.
14. Both parties testified that he assembled funds from his teacher's pension and by borrowings as well as temporary employments during the summers to cover the tuition and living expenses to secure his law degree.
15a. The DEFT argues that she rendered substantial contributions in support of the PLTF as he earned his professional degree. Also that as a result of supporting the PLTF in his endeavors, she had incurred costs and had passed up opportunities of her own. There is no support for either of these positions in the testimony presented to the court. The DEFT rendered very minimal emotional comfort or financial support as referred to supra.
 b. After the PLTF went to Florida to study, the DEFT remained at the restaurant earning $300 gross per week plus tips. She left this work and started selling cosmetic products for Herbal Life Company on commission and as a supervisor of two underlings for about a year from late 1983 through 1984 and grossed about $50,000. Then for some reason her sales collapsed and she moved to a trucking concern from late 1984 to the middle of 1987. Here she was earning $6.00 per hour and working from 60 to 80 hours per week. She left this work voluntarily after she had secured a license to sell real estate. She had informed PLTF that she wanted to get into real estate. He agreed and she got her real estate license in the middle of 1987. Until her first real estate sale in January 1988, she had no earned income for CT Page 5157 approximately six months. She testified that 1985, 1986, 1987 were her good years. The PLTF was studying at law school in 1985 and one-half of 1986 to his graduation. He was admitted to practice law in Connecticut later in 1986. In January 1987 he started to work for the State. During the PLTF's years at school the DEFT, from about October 1983 to June 1985, lived with his mother almost expense free. After his first year in Florida, the PLTF attempted to transfer to Connecticut and succeeded in obtaining a transfer to the University of Bridgeport Law School for his last semester ending in June 1986.
16a. The DEFT has done well in caring for herself. She started in her third real estate office in 1988 with Heritage Properties and was so employed during these dissolution hearings. She claimed that for a six-month period from approximately June 1992 to the middle of January 1993 she earned approximately $12,000. She added to this testimony the statement that during the year prior to the hearings she had been depositing $2,000 per month for her expenses. This would obviously add up to $24,000 annually. However, on her financial affidavit she shows gross weekly earnings of $311.53 which times 52 equals only $16,200. If we add the $100 per week the PLTF has been giving the DEFT, the total gross gets closer at $21,400.
 b. The PLTF, after his admission to the bar, started working January 1987 in the State's Attorney's office in Middletown at $28,000. In his earlier teaching profession his highest earnings reached $23,000. On his latest financial affidavit of January 29, 1993 the PLTF listed his gross earnings at $51,521. His deductions which include taxes and union dues total $324.48. Thus his net becomes $666.31 weekly and $34,648 annually. He has $23,100 of liabilities of which the principal item is $8,800, the balance of $15,000 for school loans. His assets are at a minimum including a 1986 Saab motor vehicle, $270 in two bank accounts, a life insurance policy, and an unvested pension of the State at this time.
 c. The DEFT's liabilities are $6,565 including $5,000 owed to her attorney. Among her assets she has a Nissan Sentra, and a total of $3,100 in two bank accounts.
17. It has previously been noted that while the PLTF was at CT Page 5158 school, the DEFT lived for a good period of time with his mother with just about no household expenses except her food and other personal items. It should also be noted that from January 1986 until May of 1987 both parties lived with his mother and paid no rent.
18. It is agreed that the PLTF managed to a greater degree the finances of the family. The parties set up a number of bank accounts. They agreed to put 80% of the PLTF's paychecks into a joint checking account to pay their joint debts. He would keep the 20% for their other uses. She never saw his checks. They had little or no social life to spend his 20% that he retained. She was to put 20% of her commission payments into an account for payment of taxes on her earnings. The balance was to go into a joint savings account. When the checking account, into which the PLTF put his 80% was inadequate or insufficient to meet expenses, he would ask her to withdraw funds from the joint savings account. Initially the DEFT would deposit the 80% of her earnings checks into a joint savings account which remained joint until August 1990 when without informing the PLTF she changed the account from joint to a single account in her name.
19a. Perhaps the greatest issue that developed between the parties and which led to the downfall of this relationship was that of adoption. She was physically unable to conceive and the parties had talked about adoption prior to their wedding. The PLTF wanted very much to become a father. The discussions were at a low key during 1986 while they were sharing his mother's residence. There were too many problems including financial ones. Finally in June 1987 they were able to get their own apartment on Warren Street, New Haven.
 b. Now the question of adoption came up a lot as the PLTF pressed. He testified that he found the DEFT to be evasive. She, however, testified that she told him that they had nothing accumulated and that she was "scared." This had been her position when she did not like his decision to attend law school. Here there is a disagreement as to when the parties had their first major separation. It was in the fall but the DEFT says 1987 and the PLTF places it at 1988, testifying that they were for a period of approximately one year fighting constantly even over trivial matters. His CT Page 5159 grandmother was going away for six weeks and he told the DEFT that they needed a separation and that he would live at his grandmother's residence when she vacated. On the day he was scheduled to leave, the DEFT now agreed to go ahead with the adoption. They separated for four to six weeks.
20. PLTF contacted the adoption agency and arranged the initial meeting wherein they secured the necessary forms to apply in September 1988. Even though the forms were lengthy, the PLTF completed his set within two weeks. She delayed despite his urgings and his help until she was ready to depart for her Florida visit to her parents.
21. The parties were rejected as suitable parents for adoption by the agency. The reason given was that their marriage was unstable. This was blamed by the PLTF on the DEFT's disclosure that they had had two separations. This disclosure had been made by her contrary to the PLTF's request. This did not daunt the PLTF who reapplied, secured a second home study and review and ultimately the acceptance to proceed further with the adoption.
22. Here again the DEFT prevented the adoption. She had control of the only bank account with substantial funds. This account had been a joint account which she had converted into her single account, having had his name removed. The PLTF wanted very much to go through with the adoption so that the parties could have a child. The account in question had approximately $20,000. The DEFT refused to release any funds for purposes of completing the adoption. This I believe was the final straw of a marriage that had been deteriorating for a number of years. In the final arguments the parties agreed that the marriage would have been terminated a number of years earlier, probably five, if the DEFT had stated clearly her opposition to the adoption.
23a. We have a marriage of approximately ten years viable duration. However, from early 1987 on, the marriage had more form than substance. The DEFT claims to have played a major supporting role during the years the PLTF studied law which led to his present position as lawyer. As indicated above I do not find this to be true upon a full and fair consideration of all the credible evidence presented. On the adoption issue I find her position could have been possibly the more reasonable one. She had the prior CT Page 5160 experience which the PLTF had not had. One may acknowledge that her desire to have her own home before any adoption has some merit. However, this reasoning would ignore all those parents young and old who have lived and now live in rented premises having raised natural or adopted children. Reviewing all the action of this DEFT with respect to her devious manners resulting in obstructions temporary and permanent, I cannot accord her credibility or sincerity. He acknowledged that some of the fault for the failure of the marriage was his. On the other hand, she was not totally sincere in her method of handling this problem.
 b. At the present time he does have a superior earning capacity. However, as was indicated in closing argument, she has been and is an enterprising and resourceful person and as a result has been able to provide for herself and her child and was also of financial assistance early in the marriage, of late she has voluntarily diminished her earning capacity by reducing her working hours without reasonable reason therefor. When she expressed a desire to go to school to obtain her real estate license, the PLTF agreed and supported her in her endeavors. She completed her schooling and was successful in securing her license. At the dissolution hearing she expressed a desire to again attend school to be able to secure employment wherein she might be eligible for medical insurance coverage and for pension benefits. This desire for further schooling was not expressed until the dissolution proceedings were initiated. She testified that she had not considered this prior to the present action and had not made any applications to any educational institution. It is all very vague. By her own testimony from January through June 1992 she spent ten weeks in Florida, leaving her available for work in Connecticut for only sixteen weeks. Finally I do not believe the DEFT is equitably entitled to share in the PLTF's pension benefits. Again as indicated in this memorandum of decision the parties came to a parting of the ways without having managed to accumulate any assets worthy of note. The PLTF reveals in his financial assets some heavy liabilities which are his responsibility.
24. The PLTF was born November 29, 1947 and the DEFT was born January 10, 1943. She was 38 years old at time of marriage and he was 34. Both of the parties are physically healthy but the DEFT did indicate that she was under some emotional CT Page 5161 strain for which she sought therapy but found it was too costly. No medical or other special evidence was offered.
25. Prior to bringing this action the PLTF had developed a new relationship with a female whom he had met through his work. She was married and had two children. She was having marital difficulties when she met the PLTF in his official capacity. After her dissolution became final, the PLTF began dating her. They became seriously involved romantically, conceived a child who was born on October 5, 1992. At the hearing the PLTF testified that he was renting a house and that his child and the mother with her two children were living with him. I do not find that this was the cause of the breakdown of the marriage between the parties to this action. It had already terminated. The PTLF is supporting his child.
There was much more testimony presented which could be further analyzed and weighed in this memorandum. However, I believe enough has been presented to demonstrate a fair and impartial consideration of all the testimony presented and the application of the factors set forth in sections 46b-62, 81 and 82 of the Connecticut Statutes.
The following orders are entered:
 1. A decree dissolving the marriage on the ground of irretrievable breakdown my enter.
 2. The PLTF shall pay to the DEFT as permanent periodic alimony the sum of one hundred ($100) dollars per week. This order shall be retroactive to April 21, 1992. The PLTF shall be given credit for all payments voluntarily made to the DEFT. Any arrearage remaining shall be added to this order at the rate of fifteen ($15) per week until such arrearage shall be paid in full. Alimony payments shall terminate upon the happening of the first of the following: the remarriage of the DEFT, her cohabitation pursuant to the statute, death of either party, or at the end of five years from the date of this memorandum of decision. The five-year period is believed by the undersigned to be a sufficient time for the DEFT to establish herself further in the real estate business and to allow it to recover from its depressed position. It should also help her to supplement her earnings, if she decides to put in enough time and effort CT Page 5162 and forego some of her Florida visits or limit their duration each time, so as to enable her to study evenings for whatever advancement she may aspire to. However, to avoid further litigation on this question, the order is not non-modifiable because of the uncertainties of the future in the real estate business and the lack of expert testimony to assist the court on this question.
 3. The DEFT shall be carried as a beneficiary on the PLTF's medical insurance program until she shall be able to obtain the same through her own employment but in no event beyond three years from this date. During the first eighteen months of this coverage commencing July 1, 1993 she shall reimburse the PLTF for one-half the premium costs. Prior to July 1, 1993 said premium costs shall be born by the PLTF. During the remainder of the three-year period the DEFT shall be solely responsible for the premium costs and shall thus reimburse the PLTF monthly. All deductible amounts, all uninsured and unreimbursed expenses shall be paid for solely by the DEFT who shall hold the PLTF harmless therefrom and indemnify him for any damages incurred including a reasonable attorney's fee.
 4. Disposition of the two automobiles has previously been ordered.
 5. Each party shall be liable for the liabilities set forth upon their latest respective financial affidavits plus any incurred by either of them since that date except as hereinafter otherwise provided. Each shall save the other harmless and indemnify the other which shall include a reasonable attorney's fee.
 6. The parties shall each retain as his or her sole property any bank accounts they each have.
 7. The DEFT shall have no claim to any pension account or deferred compensation account that the PLTF may now or hereafter have.
8. The DEFT shall have her maiden name restored to her.
 9. The PLTF shall pay to the DEFT's attorney on account of attorney's fees the sum of twenty-five hundred ($2,500) dollars. This sum shall be paid as follows: One thousand CT Page 5163 ($1,000) dollars on or before July 1, 1993, one thousand ($1,000) dollars on or before October 1, 1993, and five hundred ($500) on or before January 15, 1994.
Counsel for the PLTF will prepare the judgment file.
John Ottaviano, Jr. State Trial Referee